HENRY S. ROWAN *vs.* THE SHARPS' RIFLE MANUFACTURING COMPANY.

31   1
35   128

R & L, in January, 1852, entered into a written contract with the Sharps' Rifle Co., by which they agreed, with the aid of certain advances to be made by the latter, to purchase land, erect thereon a factory, equip it with all necessary machinery, and manufacture 20,000 rifles for Sharps' Rifle Co., on or before January 1st, 1855; the legal title to the land and factory to be conveyed to the Sharps' Rifle Co., by whom it was to be held until the contract for the manufacture of the rifles was performed, when it was to be reconveyed to R & L, unless Sharps' Rifle Co. should in the meantime elect to purchase the property, which they were to have the right to do, within a specified time, on giving six months' written notice of their election; the price at which they were in that case to take it, to be fixed by three disinterested appraisers, one chosen by each party, and the third by the two thus appointed. Afterwards, while Sharps' Rifle Co. held the title to the property, and before the contract of R & L for the manufacture of the rifles was fully performed, and while Sharps' Rifle Co. had the right of election as to the purchase, which they had not exercised, R & L, being desirous to obtain from the company a release of a portion of the property to enable them to mortgage the same to F H & Co., to secure the latter for large advances made and to be made upon a contract of R & L and others with F H & Co. for the manufacture of rifles for the British Government, applied to Sharps' Rifle Co. for such

VOL. XXXI.          1

Rowan *v.* Sharps' Rifle Manufacturing Co.

release ; and the latter passed a vote, authorizing the president of the company to execute a release of " the company title and interest " in a certain portion of the land and buildings, " to R & L, to enable them to secure the sum of $130,000 advanced them by F H & Co. toward a contract for 25,000 Minie rifles, and on the fulfillment of said contract said land and buildings to be reconveyed to the company." The release was executed, and a mortgage of the portion released was immediately thereafter made by R & L to F H & Co., who had knowledge of the conditions of the vote. Held that, after the release, Sharps' Rifle Co. did not retain, as against F H & Co. and their assigns, the right to take at an appraisal the portion of the property released, and to substitute the price for the property in the hands of F H & Co., but that their release was to be considered as covering their right of purchase as well as their mortgage lien .

Held also, that the contract of R & L with Sharps' Rifle Co., of January, 1852, and the legal title conveyed to the company under its provisions, constituted together a mortgage in the hands of the company for the security of the performance of the contract of R & L for the manufacture of the rifles ; the fact that the contract, which constituted the defeasance of the deed, was a separate instrument from the deed, making no difference.

Also that it was not any the less a mortgage by reason of the provision of the contract that Sharps' Rifle Co. might take the property at an appraisal. This was an independent provision, not affecting the rest of the contract. R & L retained a perfect right to make a second mortgage subject to this lien. If Sharps' Rifle Co. should not elect to purchase, then the second mortgagee would hold an ordinary mortgage interest in the land. If they should elect to purchase, then the mortgage would operate as an assignment to the mortgagee of the right of R & L to the purchase money.

An assignee of the mortgage of F H & Co. brought a petition for a foreclosure upon it against Sharps' Rifle Co. who had a later incumbrance on the property. The committee to whom the case was referred, found, among other facts, the value of the property. Held that, even if the right to take the property at an appraisal had not been released by Sharps' Rifle Co., yet that they could not avail themselves for that purpose of the finding of the value made by the committee, as by the contract the value was to be fixed by three appraisers specially appointed for that purpose and in a mode specially provided.

The petitioner held the mortgage as the agent of the British Government, and was enforcing the security for the benefit of that government. Sharps' Rifle Co. set up in their cross-bill a claim on the British Government for damages growing out of a separate contract of their own with that government for the manufacture of rifles for the latter, in which they claimed that by reason of changes in the model, and of wrongful conduct on the part of the inspectors of the British Government, they had been delayed in the delivery of the rifles, and had thus been subjected, under a provision of the contract, to a reduction in the price of a large part of the rifles, and that the British Government inequitably withheld a large sum thus deducted from the full price of the rifles. Held that, so far as the respondents had established a just claim against the British Government on the above grounds, they had a right to set off such claim against the mortgage debt.

The contract between the respondents and the British Government, under which the latter claimed the right to withhold the money claimed by the former, was

dated March 26, 1856. The manufacture of the rifles which the respondents were to deliver under that contract had been already commenced under a prior contract. The contract of March 26, 1856, provided for the times and amounts of the various deliveries, for the payment of $25 per rifle for all delivered within the times agreed, and for the payment of $20 per rifle for all delivered after the time, and also provided that the contract previously existing should be at an end. Held that the respondents, in showing the damage that they had sustained by the delay caused by the changes in the model and by the improper conduct of the inspectors of the British Government, could not go back of the contract of March 26, 1856.

BILL for a foreclosure. The respondents filed an answer and cross-bill, and the case was referred to a committee, by whom the facts were found.

The mortgaged premises were the two outer sections of a tract of land of about twenty-five acres, situated in the town of Hartford, upon the central section of which stood a rifle factory, known as Sharps' Rifle Factory. The mortgage was made by Robbins & Lawrence to Fox, Henderson & Co., of London, in Great Britain, on the 11th of December, 1855, to secure the sum of $130,000 advanced by the latter upon a contract of Robbins & Lawrence and of the Robbins & Lawrence Company, a corporation of which Robbins & Lawrence were principal members, for the manufacture for Fox, Henderson & Co. of twenty-five thousand Minie rifles. Fox, Henderson & Co., who were contractors with the British Government for the furnishing to that government of a large quantity of rifles, and received from the British Government as advances to themselves the $130,000 which they advanced on the contract, afterwards assigned the contract, together with the mortgage, to the petitioner, Rowan, as the agent and representative of the British Government, who now held the same, and the petitioner was now enforcing the security as such agent and for the benefit of the British Government.

The whole tract of twenty-five acres was originally purchased by Robbins & Lawrence under a contract with the respondents, Sharps' Rifle Manufacturing Company, dated January 9, 1852, by which Robbins & Lawrence agreed, with the aid of $40,000 to be advanced to them by the respondents, to purchase a suitable tract of land in the town of Hart

ford, and erect thereon the necessary buildings, and to furnish the same with the necessary machinery and tools, for a factory of the first class for the manufacture of fire arms, and of sufficient capacity to manufacture· ten thousand Sharps' patent fire arms per annum ; the whole to be completed before the end of August, 1852 ; and the land, buildings and machinery to be conveyed to the respondents, and the legal title to remain in them during the continuance of the contract subject to the possession and use of the same by Robbins & Lawrence. Robbins & Lawrence further agreed to manufacture and deliver to the respondents twenty thousand Sharps' patent rifles on or before the 1st day of January, 1855. for a price named in the contract, which was to be paid on delivery. The contract then proceeded as follows :—

"And at the expiration of this contract, to wit : on the first day of January, 1855, it shall be at the option of said party of the second part, (Sharps' Rifle Manufacturing Company,) to hold, have, and enjoy the absolute and unconditional title of all such lands, buildings, power, privileges, machinery, tools and appurtenances connected with said armory, and to have the exclusive possession and enjoyment thereof forever thereafter, they yielding and paying therefor to the said party of the first part (Robbins & Lawrence) a fair valuation to be agreed on by the parties, or, in case of their inability to agree, to be fixed and established by three competent men, one to be named by each party, and the two thus named to select a third to act in concert with them, who shall fairly estimate the value thereof, and their decision, when so made, to be final and conclusive on the parties : provided, however, that said party of the second part shall, in case they elect to take said armory and equipments as aforesaid, give at least six months' notice in writing to that effect to said party of the first part, their heirs, executors or administrators, prior to said first of January, 1855. * * * And said party of the second part hereby covenants and agrees to and with said party of the first part, their heirs, executors, administrators and assigns, that in case the said party of the second part do not elect to take and hold said armory and the estate con-

Rowan *v.* Sharps' Rifle Manufacturing Co.

nected therewith as aforesaid, that said party of the second part, their successors and assigns, will execute and deliver to said party of the first part, or to their legal representatives, conveyances of release thereof, whenever this contract, and the contract hereunto annexed as aforesaid, shall have been fully executed in all their parts by said party of the first part, their heirs, executors, administrators or assigns, so far as the same are obligatory and binding on them."[*]

Soon after the execution of this contract Robbins & Lawrence purchased the land in question and erected and equipped a factory thereon for the manufacture of rifles and proceeded to manufacture Sharps' rifles for the respondents under the contract. On the 23d of September, 1853, the respondents having made further advances to Robbins & Lawrence beyond the $40,000 stipulated for in the contract, the latter executed a mortgage of the real estate and machinery, and of all the tools, stock, and personal property on the premises, to the respondents, to secure the original advance of $40,000 and such later advances. On the 9th of December, 1854, Robbins & Lawrence executed a mortgage of the premises, subject to that of the respondents, to the Robbins & Lawrence Company, a corporation before-mentioned, located in Vermont, to secure an indebtedness to the corporation of $75,000 for machinery furnished them for the factory. This mortgage is not important to the present case.

The title to the real estate thus taken by the respondents, by the absolute conveyance made to them under the contract of January 9, 1852, and by the mortgage of September 23, 1853, was held by them without change until the 11th day of December, 1855, at which time the contract of Robbins & Lawrence to make and deliver the twenty thousand rifles to the respondents had not been fully performed.

Previous to this time, on the 8th of March, 1855, the Robbins & Lawrence Company, which was engaged in the manu-

---

[*] This contract is set out in full in the report of a former case between the same parties, 29 Conn. R., 284. That case, though involving some of the same facts, is entirely distinct from the present one.

facture of arms at Windsor in the state of Vermont, had entered into the contract before referred to, with Fox, Henderson & Co., for the manufacture and delivery to the latter of twenty-five thousand Minie rifles, the contract providing that Fox, Henderson & Co. should advance to them the sum of $100,000 upon the contract, to be repaid by a deduction of $4 from the price of each rifle in making payment for the same. Robbins & Lawrence, who owned the principal part of the stock of the company, had taken upon themselves at Hartford the manufacture of parts of the rifles under the contract. Shortly before the 11th of December, 1855, the Robbins & Lawrence Company, finding itself in need of further advances to enable them to go on with the contract, applied to Fox, Henderson & Co. for the same, and they, in connection with the agent of the British Government, for which the rifles were ultimately intended, and which furnished as advances to Fox, Henderson & Co., the moneys advanced by them on the contract, agreed to advance $30,000 more, on receiving satisfactory security for the new advance, and for the $100,000 already advanced; and it was thereupon arranged that the Robbins & Lawrence Company should assign to Fox, Henderson & Co. the $75,000 mortgage of December 9th, 1854, held by them, and before referred to, and that Robbins & Lawrence should procure a release from the respondents of their interest in a portion of the tract held by them, and mortgage the same to Fox, Henderson & Co. The parties interested in the arrangement thereupon applied to the respondents for such a release, and on the 11th of December, 1855, the respondents passed the following vote.

" *Voted*, that the president be authorized to execute a release of the company title and interest in and to the land and buildings lying east of a line drawn parallel to the eastern wall of the boiler house annexed to the main factory building, and distant therefrom in an easterly direction three feet, extending from the Little River on the north to the Babcock farm on the south, except the strip of land lying north of the street and between the brook and the enclosed land, on which strip of land the cartridge shop and magazine of the company

are situated; also all the land and buildings thereon lying west of a line drawn from Little River to the Babcock farm, parallel with the west side of the factory building and distant therefrom one hundred and fifty feet; to Robbins & Lawrence, to enable them to secure the sum of one hundred and thirty thousand dollars, advanced them by Fox & Henderson, toward a contract for twenty-five thousand Minie rifles, and on the fulfillment of said contract said land and buildings, with all the machinery, tools, engines and fixtures, to be reconveyed to said Sharps' Rifle Manufacturing Company; and upon condition that the said Robbins & Lawrence execute a mortgage of said premises, buildings, machinery, stock, fixtures and tools so mortgaged to said Fox & Henderson, or to other parties for their use and benefit, to said Sharps' Rifle Manufacturing Company, independent of any other lien; and also to secure to the company the right to take the entire property, as contemplated by the contract of 9th of January, A. D. 1852, at such time as may be acceptable to the executive committee."

On the same day, after the passage of this vote, the president of the company executed a release, unqualified in its terms, of the two sections described in the vote, to Robbins & Lawrence, who immediately after executed a mortgage of the same to Fox, Henderson & Co., the latter at the same time making the further advance of $30,000.

An agreement extending the time within which the respondents were to elect to purchase the property under the contract of January 9, 1852, was executed by Robbins & Lawrence, but the mortgage which by the terms of the vote Robbins & Lawrence were to execute to the respondents, subject to the mortgage to Fox, Henderson & Co., was never made. The respondents being by the terms of the vote entitled to such later mortgage, had an equitable interest in the premises, which was conceded by the petitioner in his bill, if the facts were established, as giving them a right of redemption in the property, and the bill was brought to foreclose this right.

On the 14th day of October, 1857, the respondents, having previously given the notice required by the contract of their

election to take the property under the contract of January 9, 1852, took, at an appraisal made according to the contract, and upon the proceedings provided for therein, all the factory property except the two sections which had been released to Robbins & Lawrence on the 11th of December, 1855, and by them mortgaged to Fox, Henderson & Co. The whole amount of the appraisal of the property so taken, was $147,241.32. The whole amount of the indebtedness of Robbins & Lawrence to the respondents at that time was $147,382.70—leaving a balance of indebtedness unpaid of $141.38. This however did not include damages for the breach of the contract for the manufacture of twenty thousand rifles for the respondents, which contract the committee found had never been fully performed, but did not find what, if any, damage had been sustained by the respondents by reason of the non-performance.

The respondents claimed that, in releasing the land for the purpose of enabling Robbins & Lawrence to mortgage the same to Fox, Henderson & Co., the property thus released stood in the position of a surety to the mortgage debt, and that by reason of certain changes in the contract secured by the mortgage and of certain proceedings on the part of Fox, Henderson & Co., the property mortgaged was in equity discharged from its liability and reverted to the respondents free from the incumbrance of the mortgage. As the court expresses no opinion upon this point, the case being decided wholly upon other points, the facts upon which this question arose, which are numerous and complicated, and a statement of which would occupy much space, are omitted.

The committee found that the amount due to the petitioner upon the mortgage was $104,501.54—unless the petitioner was bound to make certain applications of rifles delivered under the contract differently from what he had done, in which case the amount due upon the mortgage was found to be $84,082.45. The value of the property covered by the mortgage was found to be $33,000. Robbins & Lawrence and the Robbins & Lawrence Company had failed before the petition was brought, and were entirely bankrupt.

Rowan v. Sharps' Rifle Manufacturing Co.

The petitioner had in a former suit foreclosed Robbins & Lawrence upon the mortgage, but had not made the present respondents parties. He had also obtained possession of the mortgaged premises by an action of ejectment and was now in possession.

The respondents in their cross-bill set up a large claim against the British Government, of which they claimed the right to avail themselves in the present suit. The facts with regard to that claim were briefly as follows:—On the 24th of July, 1855, the British Government sent to the agent of the respondents in London an order for one thousand Sharps' rifles at £5 per rifle, delivered in London, to be inspected by viewers in America, appointed by the British Government, and " to be sent forward with as little delay as possible;" which order was accepted by the agent of the respondents. On the 17th of August, 1855, the British Government made a further order for five thousand more rifles, at the same price and subject to the same terms, which was also accepted. A rifle manufactured by Robbins & Lawrence for the respondents, and which had been previously sold to the British Government, was sent to the respondents by the British Government, soon after the orders were given, as the model to be used, except as to the size of the bore, which was to be different, the lock of which model rifle was of the kind known as Sharps' primer lock. After the respondents had made preparations for the manufacture of the rifles ordered, the British Government, through its agent at Hartford, required that a kind of lock known as Maynard's primer lock should be substituted for Sharps' primer lock. On the 9th of November, 1855, the respondents made a contract with Robbins & Lawrence, by which the latter agreed to manufacture for the former six thousand five hundred Sharps' rifles, with the Maynard primer, at $14.50 each—of which six thousand were to be subject to the inspection of the British viewers, and were intended for the British Government. On the 9th of February, 1856, none of the rifles having been then delivered, notice was given by the British Government that they were dissatisfied with the delay, and that the contract would be terminated

at the expiration of one month from the time of the receipt of the notice and all rifles rejected that were not received within that time. On the 4th of March, 1856, the agent of the British Government at Hartford, proposed to the respondents the substitution of a new contract in the place of the one then existing, to which the respondents, after having it for some time under consideration, assented, and on the 26th of March, 1856, the following contract was executed by the respondents and by the agent of the British Government :—

" Articles of agreement entered into this 26th day of March, A. D. 1856, by and between Sharps' Rifle Manufacturing Company, by John C. Palmer, president of said company, and the British Government, by J. P. Warlow, Capt. R. A., for and in behalf of said British Government :

" In consideration of the amount hereinafter mentioned to be paid to the said Sharps' Rifle Manufacturing Company by the British Government, the said company hereby agree to sell and deliver to the British Government six thousand Sharps' breech-loading carbines, upon the terms and conditions hereinafter specifically set forth and mentioned, viz. : That said company will present, during the present month of March, four hundred carbines, which shall pass the view or inspection at Hartford, and be boxed ready for transmission to England by the first of April next. That after the 1st day of April next, said company agree that said carbines shall pass the view or inspection at the rate of three hundred per week, and be boxed ready for transmission, up to the 27th day of May next, and that from the 27th day of May next, up to the 22d day of July next, said carbines shall pass the view, and be boxed up ready for transmission, at the rate of four hundred per week. That for every arm of the six thousand which shall remain undelivered on that day, to wit, the 22d day of July next, the said Sharps' Rifle Manufacturing Company hereby agree to forfeit, and hold itself responsible to the British Government, to the sum of five dollars, as liquidated damages for the violation of this contract. And it is further agreed, in order to secure the delivery of said arms in the quantities named at the dates specified, viz., 400 by April 1st, 1,200 more by

April 29th, 1,200 more by May 27th, 1,600 more by June 24th, and 1,600 more by July 22d, that every arm short of the number above stated which shall not pass the view at the dates above stated, shall not be passed into the next period, but the number short shall be noted at each period, and they be held responsible to the penalty of five dollars for each arm short as aforesaid, as a breach of this contract.

" And it is further agreed, that, on the 22d day of July next, it shall be optional with the officer representing the British Government, whether he will claim the five dollars penalty in cash, for each arm short of the number specified as aforesaid, or take such number of arms as shall be required to complete the six thousand at the rate of four hundred a week, at a reduction of $5 on each arm, i. e., $20 instead of $25.

*     *     *     *     *     *

" And it is further agreed that in the manufacture of said arms, the following points are to be observed :—

*     *     *     *     *     *

7th. Carbines to be fitted with Maynard's primer.

*     *     .*     *     *     *

" The company are not to be held responsible for any delay occasioned by the view of the carbines.

" And in consideration of the foregoing agreement on the part of Sharps' Rifle Manufacturing Company, the British Government agree to pay to said company, or their order, the sum of twenty-five dollars for each carbine which has passed inspection within the times herein before stated, upon delivery of the same at the Tower of London, England ; and for each carbine of the six thousand which shall not have passed inspection within the periods herein before stated, if accepted and approved by the officer representing the British Government, the sum of twenty dollars, upon delivery of the same at the Tower of London, England.

" And it is further agreed by the parties to this instrument, that the contract or order heretofore existing between them shall be considered at an end and void.

" The view or inspection of these arms to be such as Capt.

Warlow, or the officers representing the British Government, may deem necessary.

"In testimony whereof, &c."

The foregoing contract was entered into by the respondents in reliance upon the manufacture and delivery of rifles by Robbins & Lawrence, under their contract of November 9th, 1856, in season for their delivery by the respondents to the British Government; and the agents of the British Government knew of this reliance. Robbins & Lawrence failed however to deliver any of the six thousand rifles on or before the 1st day of April, 1856, and delivered only 810 by the 22d day of July, 1856, and in consequence thereof the respondents were able to deliver and did deliver only that number on their contract by the 22d day of July—leaving undelivered at that date 5,190 of the 6,000 rifles. By reason of this failure of the respondents to make the deliveries within the times stipulated, the British Government claimed at the time, and still claim, that the respondents were liable under the contract to a reduction of $5 upon the price of each of the rifles thus remaining to be delivered, amounting in the whole to $25,950, which remaining rifles they elected to receive at $20 per rifle, instead of terminating the contract and demanding the forfeiture in cash. After the 22d day of July, 1856, Robbins & Lawrence continued to manufacture and deliver to the respondents, and the respondents to deliver to the British Government, further portions of the six thousand rifles, until the 28th of October, 1856, when Robbins & Lawrence failed and became insolvent. Immediately upon their failure the respondents with their consent took possession of the factory and proceeded with the manufacture of the rifles; and made and delivered to the British Government the whole of the remaining number of rifles required by the contract. The British Government however refused to pay for all the rifles delivered after the 22d day of July, 1856, at any higher rate than $20 per rifle, making a difference of $25,950 in the amount paid; which sum the British Government withheld, claiming the right to do so under the contract, but which the respondents claimed was inequitably withheld on the ground that the

Rowan *v.* Sharps' Rifle Manufacturing Co.

delays in the manufacture and delivery of the rifles was owing to the acts of the British Government and its agents.

On this point the committee found as follows:—That between the 17th day of August, 1855, and the day of the delivery of the last of the six thousand rifles to the British Government, the British Government from time to time, against the remonstrances of the respondents, required that the rifles and the parts thereof, in other particulars than in the attachment of the Maynard primer lock and the size of the bore, should be essentially changed and altered in their construction from the model gun, and from the form and construction agreed upon by the parties, and in many instances from the form and construction previously directed by the British Government, and refused to receive, inspect or accept any of the rifles or of the parts thereof unless so changed; that the agents, viewers and inspectors of the British Government, unreasonably rejected many of the rifles, and of the parts thereof, when they had been made in compliance with their own requirements and instructions, and in some instances unnecessarily and wantonly broke, damaged and destroyed the rifles and the parts thereof when so rejected; that by reason of requiring the Maynard primer lock to be attached to the rifles, and by reason of the other changes and alterations so required, and said conduct of the viewers and inspectors of the British Government, the respondents were prevented from delivering the six thousand rifles at an earlier period than the same were delivered, and have sustained the loss of said sum of $25,950, so as aforesaid withheld by the British Government, and a further loss of $3,000 in the detention of the remaining part of the price beyond the time when they would otherwise have received it, and a further loss of $2,570.18 in the cost of stock purchased to replace what was unnecessarily damaged as aforesaid.

The respondents in their cross-bill prayed for a foreclosure against the petitioner unless he should pay the amount of their claim against the British Government.

The case was heard in the superior court upon the facts found

by the committee, before *Mc Curdy, J.*, and the court passed the following decree in favor of the respondents :—

" Henry S. Rowan *vs.* Sharps' Rifle Manufacturing Company :—Superior Court, Hartford County, March Term, 1862. In Chancery.

" Henry White, Esq., having been appointed by this court a committee to inquire into the truth of the allegations of the parties in their respective pleadings in this cause, and having been duly sworn, and having met and heard the parties with their proofs and counsel in manner and form as is in his report on file set forth, and having at the last term of this court made his report upon the matters referred to him in manner and form, as by reference thereto on file dated February 19th, 1862, will appear ; and the cause having come by continuance to the present term of the court, the petitioner and the respondents by their respective counsel appeared and were fully heard in relation to the premises and to the relief prayed thereon by the respective parties ; and thereupon this court doth accept the said report, and doth find the facts as the same are therein found by said committee ; and it appearing thereupon that the suit is prosecuted by the said Henry S. Rowan, the petitioner, as trustee for the use and benefit of the government of Great Britain, and that the defendants, Sharps' Rifle Manufacturing Company, have a right in equity, on payment of the value of the land, buildings, fixed machinery and fixtures constituting the mortgaged premises aforesaid, to redeem and hold the same for their own use and benefit as a good and indefeasible estate in fee simple, as well against said government and the petitioner so prosecuting this suit in its behalf, as against Robbins & Lawrence, the mortgagors of the premises, as contemplated by the contract of January 9th, 1852, and secured by the agreement of the 11th of December, 1855, on the requirement of the same by the defendants as a condition of the release, to some extent, of their claims upon the premises on the request of the said Robbins & Lawrence, Robbins & Lawrence Company, Fox, Henderson & Co., and said British Government ; and the value of the mortgaged premises having been ascertained and found by the court, on the report of the

committee, to be thirty-three thousand dollars; and it also appearing to the court that the government of Great Britain is indebted to the defendants, on the facts found as aforesaid, to the amount of thirty-four thousand five hundred and forty-eight $\frac{39}{100}$ dollars ($34,548\frac{39}{100}$) (including interest on the principal sum of twenty-five thousand nine hundred and fifty dollars to this 14th day of May, A. D. 1862,) by reason of the wrongful withholding from the defendants of the sum of 25,950 dollars from the contract price of 5190 carbines, which were completed and delivered to said government after the 22d day of July, 1856, in manner and form and under the circumstances stated in said report, over and above the loss and damage otherwise sustained by the defendants by the wrongful acts of the viewers and certain other agents of the said government :—

" Now, therefore, inasmuch as the government of Great Britain, being a foreign sovereignty, is not amenable to the jurisdiction of the courts of this state, and the defendants, against whom the petitioner in behalf of said government asks equitable relief, are without remedy at law for the recovery of the amount due to and withholden from them as aforesaid, but are willing and desirous, and here in court offer and insist on their right in equity to set off and apply so much of the indebtedness of said government to them as will be required to redeem the premises by the payment thereby, of the value of the same, ascertained and found as aforesaid; it is ordered and decreed by this court that the mortgaged premises shall be deemed and holden to stand charged with all the liabilities of Robbins & Lawrence to the defendants, in the same manner and to the same extent as the same would have been so charged if the said Robbins & Lawrence had, on the 11th day of December, 1855, in pursuance of the requirement of the vote of the directors of Sharps' Rifle Company, by deed duly executed and delivered, mortgaged the premises to the defendants independent of any other lien than such as was authorized by said vote ; and it is further ordered and decreed that unless the government of Great Britain, or the petitioner acting in its behalf, shall, on or before the 1st day of January,

A. D. 1863, pay into court, by depositing the same with the clerk, for the use of the defendants, and subject to their order, the said sum of 34,548.39 dollars, and the interest accruing thereon from the 15th day of May, 1862, and said sums of 3,000 dollars and 2,570, 18-100 dollars found to be the loss and damage otherwise sustained by the defendants by reason of the wrongful acts and defaults of the viewers and certain other agents of said government of Great Britain, the defendants shall thereupon be entitled to redeem and become the absolute owners in fee simple of the premises by the application and set-off of a part of said indebtedness of 34,548, 39-100 dollars, viz: to the amount of 33,000 dollars thereof, that being found to be the value of the mortgaged premises, pursuant to their offer in court as aforesaid ; and it is thereupon further decreed that in case of the failure of said British Government, or of the petitioner, to pay as aforesaid, by depositing the amount with the clerk of this court, on or before the time herein-before limited, such application and set-off shall be deemed to have been made and assented to without any further act on the part of the defendants, and the title of the mortgaged premises shall thereafter be vested absolutely in the defendants, as an indefeasible estate in fee simple."

The petitioner filed a motion in error, and brought the record before this court for revision.

*T. C. Perkins* and *Hooker*, with whom was *H. Whittaker* of New York, for the petitioner.

*Hungerford* and *Baldwin*, with whom was *Cone*, for the respondents.

HINMAN, C. J. The original bill seeks to foreclose the respondents' interest in certain mortgaged premises, but the parties have conflicting claims to the property, and the result in the superior court was a decree in favor of the respondents upon their cross-bill and answer, by which the petitioner's interest therein was foreclosed, unless he paid to the respondents

a large sum of money claimed as damages against the British Government, represented in this cause by the petitioner, Rowan.

The premises are the two outer sections of a tract of about twenty-five acres, upon the central section of which the respondents' rifle factory is situated. The whole tract was purchased by Robbins & Lawrence for the purpose of erecting the factory thereon, (and which was soon after the purchase erected,) under a contract between them and the respondents, dated January 9th, 1852, by which they bound themselves, with the aid of $40,000 advanced by the respondents on their giving satisfactory security therefor, to purchase the necessary land, and erect thereon and equip a manufactory for the making of rifles, and to manufacture for the respondents twenty thousand Sharps' rifles, to be paid for on delivery, and the whole to be made and delivered by the 1st day of January, 1855. It was further provided by the contract that the land should be conveyed to the respondents, who were to hold it until the contract was performed, and then to reconvey it to Robbins & Lawrence; with a right, however, at their election to become the absolute owners of it by purchase, upon giving six months' written notice of their election so to purchase; the price to be fixed by an appraisal, to be made by three disinterested appraisers, one to be named by each party and the third by the two thus appointed. The title to the twenty-five acres was, in accordance with the terms of the contract, conveyed to the respondents, and they have ever since held the central portion, on which the factory was built, having in 1857 become the absolute owners of it by an election to purchase it, and by proceedings taken for the purpose under the contract. On the 11th of December, 1855, they released their interest in the two outer sections to Robbins & Lawrence, to enable them to mortgage the same to Fox, Henderson & Co.; and Robbins & Lawrence having accordingly executed the mortgage, and it being now held by assignment by the present petitioner, he seeks by this bill a foreclosure upon it. After the contract of January 9th, 1852 was executed, the respondents made further advances to Robbins & Lawrence, besides the $40,000 provided for therein, to secure which Robbins & Lawrence, on

the 23d of September, 1853, made a mortgage of the same estate, with the factory thereon and the machinery contained in it, the factory having been then built and equipped, to the respondents, to secure them for the original $40,000, and for such subsequent advancements.

The respondents' rights in the property then, previous to their release of the 11th of December, 1855, were based upon the contract of the 9th of January, 1852, with the legal title which they held under that contract, and upon the mortgage of September 23d, 1853.  The contract of January 9th, 1852, so far as it provides for a conveyance of the legal title to the land to the respondents, and a reconveyance by them to Robbins & Lawrence when the twenty thousand rifles were manufactured and delivered, in connection with the fact that the legal title to the land was by deed conveyed to the respondents pursuant to the contract, shows clearly that the land was held by them as a security for the performance of that contract for the manufacture of rifles.  If this part of the contract had been embodied in the deed it would have been but an ordinary defeasance in a mortgage, and it can surely make no difference that two instruments instead of one were executed, or that they were executed on different days.  If they were to form but parts of one contract, courts should give effect to them according to the intention of the parties.  As a security for the performance of the contract to manufacture and deliver twenty thousand rifles, the land can only be held for such damages as the respondents have suffered by the failure of Robbins & Lawrence to perform that contract, and Robbins & Lawrence would be equitably entitled to demand a reconveyance to them on their performing the contract or paying the damages caused by their non-performance.  The provision for the purchase by the respondents at their election is all that gives the contract any peculiarity.  But this is an independent provision in the contract, the performance of which on the part of Robbins & Lawrence was secured, if the respondents should elect to purchase, by their taking the legal title in the first instance, instead of relying upon the voluntary act of Robbins & Lawrence, or upon the power of a court of equity to enforce

such performance. But it did not operate to restrict the power of Robbins & Lawrence to convey their equitable interest in the land. Such a conveyance would operate to pass the title to the land in case the respondents elected not to purchase, and would amount to an assignment of their claim upon the respondents for the price of the land if they elected to purchase it. And this was the view taken of this contract in the late case between the same parties. 29 Conn., 282. If this was the position of the respondents on the 11th of December, 1855, when they released to Robbins & Lawrence their title to the portion of the land now in controversy, to enable them to mortgage it to Fox, Henderson & Co., upon which mortgage now held by the petitioner this bill was brought, it is obvious that the only effect of holding that release to have been executed under such circumstances that the interest released stands like a surety for the debt of another, and is discharged in this case by the transactions between Robbins & Lawrence and the mortgagees, is to postpone the petitioner's mortgage to the prior incumbrance created by the contract of January 9th, 1852, and the conveyance to the respondents of the legal title pursuant to that contract, and also to their mortgage of September 23d, 1853. Without, therefore, determining the legal effect of the circumstances which are claimed to operate to avoid that release, let us see if the decree of the superior court can be sustained upon the assumption that there had been no such release executed. The consequence of holding the release to be inoperative would be, that the respondents would be re-instated in the same position which they occupied before the release was executed; in which case they would be entitled to hold the property as security for the balance of their account against Robbins & Lawrence, and for any damages they had sustained by the non-fulfillment of the contract to make the twenty thousand rifles, and would be enabled to take the property at an appraisal. Subject to these rights of the respondents the petitioner is most obviously entitled to his mortgage to secure the $130,000.

Before coming, however, to the questions arising upon the decree in favor of the respondents on their cross-bill, it is

proper to notice the very broad claim which they make, that notwithstanding the release deed executed by them through their president on the 11th of December, 1855, and the vote of the corporation under which that deed was executed and delivered, their right to take the land under an appraisal, as against the mortgagees of Robbins & Lawrence and the present petitioner, was still retained by them, irrespective of the question whether the deed and vote were made and passed under such circumstances as to impress upon the property the character of suretyship for the debt for which it was mortgaged, with the rights of a surety as to a discharge by the subsequent acts of the mortgagees. The release deed is in the most general terms, and is comprehensive enough to include every interest that the respondents had in the land at the time it was executed. But it is said that the terms of the vote, which was the only authority that the president of the company had for the execution of the deed, preserved to the respondents their right to take the land at an appraisal as against the mortgagees of Robbins & Lawrence. We think this claim can not be sustained. Before that vote was passed, Fox, Henderson & Co., who seem to have been contractors with the British government for the furnishing of arms to that government, had contracted with a Vermont corporation, called The Robbins & Lawrence Company, for the manufacture by the latter of twenty-five thousand Minie rifles, and had advanced to that company the sum of $100,000, to be repaid by a deduction of $4 from the stipulated price of each rifle, upon paying for the same as delivered. Robbins & Lawrence were the principal stockholders in this corporation, and had taken upon themselves the manufacture at Hartford of certain parts of the rifles for the corporation. The company found themselves in need of further advances, which Fox, Henderson & Co. were willing to make on receiving satisfactory security. To accomplish this purpose, Robbins & Lawrence, and the corporation of which they were the principal stockholders, Fox, Henderson & Co., and the British government, applied to the respondents to release a portion of the tract of land held by them, to Robbins and Lawrence, to enable them to make security upon unin-

cumbered property for such past and contemplated advances, and upon this application the directors of the company passed the following vote:

" *Voted,* That the president be authorized to execute a release of the company title and interest in and to the land and buildings lying east of a line drawn parallel to the eastern wall of the boiler house annexed to the main factory building, and distant therefrom in an easterly direction three feet, extending from the Little River on the north to the Babcock farm on the south, except the strip of land lying north of the street and between the brook and the enclosed land, on which strip of land the cartridge shop and magazine of the company are situated; also, all the land and buildings thereon lying west of a line drawn from Little River to the Babcock farm, parallel with the west side of the factory building and distant therefrom one hundred and fifty feet; to Robbins and Lawrence, to enable them to secure the sum of one hundred and thirty thousand dollars, advanced to them by Fox & Henderson, toward a contract for twenty-five thousand Minie Rifles; and on the fulfillment of said contract, said land and buildings, with all the machinery, tools, engines and fixtures, to be reconveyed to said Sharps' Rifle Manufacturing Company; and upon condition that the said Robbins and Lawrence execute a mortgage of said premises, buildings, machinery, stock, fixtures and tools so mortgaged to said Fox & Henderson, or to other parties for their use and benefit, to said Sharps' Rifle Manufacturing Company, independent of any other lien; and also to secure to the company the right to take the entire property, as contemplated by the contract of 9th of January, A. D. 1852, at such time as may be acceptable to the executive committee."

We think, notwithstanding the ingenious argument of the respondents' counsel, that it was the clear intention of the parties by this vote to release the right of purchase provided for by the contract of January 9th, 1852, as well as every right and interest which they had in the two outer sections of land described in it. Such to our minds is the plain import of the vote itself, and taken in connection with the deed, and with an agreement made by the respondents with Rob-

bins & Lawrence alone for the extension of the right to purchase, when the contemplated mortgage to Fox, Henderson & Company was satisfied, we can not doubt that such was the intention at the time. It is obvious, however, that this question would be unimportant if the claim of the respondents is correct, that the interest which Fox, Henderson & Company took by their mortgage was subject to be postponed, and became in fact postponed, to the claims of the respondents upon the land, by the subsequent transactions between Robbins & Lawrence and the holders of this $130,000 mortgage. And this question we are disposed not to determine or discuss in this case, since a majority of us are of opinion that the decree of the superior court must on other grounds be reversed.

By the terms of the contract, if the respondents elected to take the property they were to take it at an appraisal, made by appraisers to be specially selected and appointed for that purpose. We think that the finding of the value by the committee can not be substituted for this formal appraisal thus specifically provided for. The petitioner has a right to insist upon the terms upon which alone Robbins & Lawrence agreed to sell the land. They had provided for three appraisers, and the precise mode in which they were to be selected was stated in the contract. The judgment of the committee may be as sound as that of any other man or body of men, but it is not the judgment of the men upon whose opinion alone the land was agreed to be sold. The committee was appointed, not for his particular skill as an appraiser of real estate, but to find the facts in the case, and he doubtless acted upon the question of the value of the property, as he did upon all the other facts of the case, upon such evidence as was before him; whereas the mode contemplated by the contract looked principally, if not entirely, to the judgment of the appraisers themselves, upon a personal inspection of the property. It is obvious that the results of these two modes might be very different. Besides this there is no allegation of value in the cross-bill, for the purpose of laying the foundation for the respondents' claim to take the land; nor is it alleged that the land has in fact been taken, but the contrary is expressly

admitted.  It is difficult to see therefore what the evidence of its value had to do with the case, unless it was introduced and received for the purpose of enabling the court to fix the time of redemption if a decree should be made in favor of the petitioner.  But an inquiry for such a purpose would be made with less care, since it would be regarded as of far less importance than if the value found was to stand for the price upon an absolute sale and transfer of the title.  We can not, therefore, sustain the conclusion of the superior court in treating the title to the property as transferred to the respondents upon the valuation fixed by the committee, and for this reason we think there is manifest error in the decree.

But while this difficulty is fatal to any decree in favor of the respondents upon the claims set up in the cross-bill, it does not settle the right of the petitioner to a decree of foreclosure in his favor upon the whole case, since it may well be, that although the decree sought can not be rendered in favor of the respondents, either because facts enough are not alleged in the cross bill, or are not found by the committee, on which to base such a decree, still enough may be found to show that the petitioner has no equity which will entitle him to a decree in his favor, either for the whole or for any part of his claim.  Hence, if it be true that the respondents have a large claim against the British government, the payment of which they have no means of enforcing except by an application of it to the claim which that government is endeavoring to enforce against them through this petition, they have a right, undoubtedly, to offset so much of it as they may be enabled to establish, against the claim which that government is attempting to enforce by an appropriation of this land by the foreclosure, the respondents having very valuable legal and equitable rights in the land.  But we have great difficulty in finding from the report of the committee that any considerable amount of damage has been sustained by the respondents through the improper acts of the agents of the British government, and we do not see that this damage has been found as a fact by the committee in such a manner that we can act upon it.  It is found that by reason of the requirement that the Maynard primer lock should be attached to

certain carbines and that other alterations in the construction of the arms should be made, and by reason of certain conduct of the viewers and inspectors of the British government, the respondents were prevented from delivering the carbines at an earlier time than they were delivered, on which account damage to the amount of $25,950 was sustained. But this conduct is found to have been between the 17th of March, 1855, and the day of the delivery of the last of these carbines. Now we think there is nothing shown which can avoid the contract of March 26th, 1856; and that contract expressly provides for Maynard's primer; and what part, if any, of the misconduct was after the execution of that contract, we can not, of course, determine; and as it is no where found in the report, it is impossible to consider any portion of this, much the largest item of damages, as legally or equitably due from the British government, or any damage of which the respondents can complain. Again, if any interest in this land is claimed by the respondents in consequence of the failure of Robbins and Lawrence to perform the contract of January 9th, 1852, for the manufacture of the rifles, by reason of their neglect to manufacture and deliver them within the time specified, the damages which have accrued in consequence of this neglect are not found. It is found that the indebtedness of Robbins & Lawrence to the respondents has all been satisfied and extinguished by the taking of the central portion of the whole tract of land with the factory, &c., except the small balance of $141.38. If this is the extent of their claim on Robbins & Lawrence, then on the payment of it, with the interest, the case will be relieved of some embarrassments resulting from the very great complication of facts which it presents.

We make these suggestions not so much with reference to the simple question of whether there is error in the decree foreclosing the petitioner's interest in the premises, upon the facts alleged in the respondents' cross bill and found by the committee, as with the view of aiding the parties in presenting to the court the whole case upon any future hearing that may be had in it. We are satisfied that the decree in favor of the respondents upon their cross-bill is erroneous; first, because the re-

spondents have no where alleged that they have taken or elected to take the land which the petitioner seeks to foreclose, under the contract of January 9, 1852; secondly, because if they had made such an allegation, it is conclusively disproved by the report of the committee; and thirdly, because they have no right to take the land in any other mode than that provided for in the original contract of 1852. This is sufficient to show that there is manifest error in the decree in favor of the respondents; and we purposely abstain from advising the superior court as to whether the petitioner is entitled to a decree in his favor, and from making any observations upon several important points in the case; desiring that, in the determination of those points, if it shall hereafter become necessary to consider them, we may have the benefit of a full court, which we have not had in the present consideration of the case.

In this opinion Dutton, J., concurred; Butler, J., dissented; Sanford, J., did not sit.