HENRY S. ROWAN *vs.* THE SHARPS' RIFLE MANUFACTURING COMPANY.

33    1
68  508
33    1
e186US318

Where a person pledges his property as security for the performance of the contract of a third party, the property stands in the position of a surety; and any changes in the contract which would have discharged a surety upon the contract will discharge the property pledged as such security.

*R & L* had conveyed to *Sharps' Rifle Co.* the legal title to certain real estate under a contract by which *Sharps' Rifle Co.* were to hold the property as security for the performance of a certain contract for the manufacture of rifles by *R & L,* and with a right on the part of *Sharps' Rifle Co.* to purchase the property on certain agreed conditions. Afterwards *R & L* made a mortgage of the same premises to *Sharps' Rifle Co.*, to secure certain advances made to them by the latter to be used in the manufacture of the rifles. Afterwards *R & L* entered into a contract with *F H & Co.* for the manufacture of a large quantity of rifles for the latter, and upon the solicitation of both parties to the contract *Sharps' Rifle Co.* released a portion of the real estate held by them to *R & L,* to enable the latter to make a mortgage of the same to *F H & Co.*, to secure them for certain advances made upon the contract, and to secure the performance of the contract. The vote by which *Sharps' Rifle Co.* assented to the release contained a condition that upon the performance of the contract by *R & L* the property should be reconveyed to them for the purposes for which they originally held it. Held, that *Sharps' Rifle Co.* under the arrangement had all

VOL. XXXIII.                    1

the rights of sureties to the contract, and that the property pledged for its performance was discharged by such changes of the contract as would have discharged a personal surety upon the contract.

The original contract between *R & L* and *F H & Co.* provided that the rifles should be made "with all possible dispatch." Before the contract was performed a supplemental contract was entered into by the parties by which it was agreed that three hundred rifles per week should be delivered for a certain period, and six hundred per week afterwards. Held, that this was such a change of the contract as to discharge the surety.

The term "with all possible dispatch" means "within a reasonable time."

Even if the delivery of the number of rifles per week agreed upon in the supplemental contract would have been a reasonable delivery, yet a specified number or fixed time varies from a reasonable but uncertain number or time.

The original contract provided that *F H & Co.* might retain $4 from the price of each rifle for the payment of advances then made. The supplemental contract provided for the advancement of an additional sum, and for its repayment with the other advances by an increased deduction from the cash paid for each rifle. Held, that this was such a change as to discharge the surety.

The condition imposed upon a petitioner in equity to do a particular equity is imposed as a condition merely, without which the petitioner will take nothing by the decree, but is not made the subject-matter of a direct decree against the petitioner.

A cross-bill should set up only matter touching that in question in the original bill, or in aid of the defense to it.

Where a cross-bill to a bill of foreclosure brought by a party representing the British Government, set up an independent claim of the respondents against the British Government, it was held to be a matter which upon general principles of equity could not be set up by a cross-bill.

And it was held that it was not a sufficient ground for sustaining the cross-bill that the British Government could not be sued, and that the respondents would be without remedy unless they could enforce their claim by a cross-bill in the suit. [One judge dissenting.]

There is no principle of equity which will enable a creditor to seize the property of his debtor and appropriate it to the payment of his debt, merely because the debtor is privileged from liability to be sued; and it would be a fraud upon the privilege itself, to use the appearance of such party in court for another and distinct purpose as the occasion of making him respond to a claim that otherwise he could not be sued upon.

Such a claim could be set off against the mortgage debt.

THE decree of the superior court in this case having been reversed (*ante* Vol. 31, p. 1,) the case was again entered in that court, and in accordance with the advice of the supreme court was sent again to the committee by whom the facts were before found, for a further finding of facts. The committee afterwards made a supplemental report, finding that

the respondents had sustained no loss by reason of the failure of Robbins & Lawrence to manufacture and deliver the whole number of rifles which they had agreed to make and deliver by the contract of January 9, 1852 ; and that the amount of the loss which the respondents had sustained upon their contract with the British Government for the manufacture of carbines for the latter, by reason of the conduct of the viewers of the British Government and of changes in the form of the gun, after the 26th of March, 1856, was, with interest to the 22d day of January, 1864, $37,774.17, with a further loss of $3,000 in the detention of the remaining part of the price of the carbines beyond the time when the respondents would otherwise have received it.

The mortgage which the present petition was brought to foreclose was executed by Robbins & Lawrence to Fox, Henderson & Co., on the 11th day of December, 1855, and was afterwards assigned to, and was now held by the petitioner Rowan, who represented the British Government—the funds advanced to Robbins & Lawrence by Fox, Henderson & Co. and secured by the mortgage, having been advanced to Fox, Henderson & Co. by the British Government upon a contract of the former with the latter for the delivery of a large quantity of arms. The defeasance of that mortgage was as follows :—

" Provided always, and these presents are on the following condition, to wit : Whereas we, the said Samuel E. Robbins and Richard S. Lawrence, are jointly and severally indebted to the said Charles Fox and John Henderson, in several sums of money, amounting in the whole to the sum of twenty thousand pounds sterling, English currency, heretofore advanced by said Fox & Henderson, under and by virtue of a certain agreement, dated the eighth day of March, now last, between the Robbins & Lawrence Company of the first part, and said Fox & Henderson, by their firm name of Fox, Henderson & Co., of the second part, and to the repayment whereof, with interest thereon, at the rate of six per cent. per annum, according to the terms of said contract, we, the said Samuel E. Robbins and Richard S. Lawrence, are now liable to said

Fox, Henderson & Co., as we do hereby acknowledge : And whereas, the sum of thirty thousand dollars, currency of the United States of America, has been this day paid to us as a further advance under the said contract, and is collaterally secured by our joint and several promissory note of even date herewith, payable one day after date, for the sum of thirty thousand dollars, with interest thereon at the rate of six per cent. per annum : Now the condition of this deed is such that if we, the said Samuel E. Robbins and Richard S. Lawrence, our heirs, executors or administrators, shall and do duly perform the aforesaid contract in all respects, and well and truly repay to the said Fox, Henderson & Co. the said several sums of money so advanced in English and American currency respectively, as herein before expressed, and every of them and every part thereof, together with all interest due and to become due thereon, at the rate aforesaid, up to the time of such repayment, and also all and singular other sum or sums of money, if any, to be hereafter advanced by said Fox, Henderson & Co. to the said parties, together with interest at the rate aforesaid on such further advances, if any, up to the date of the repayment thereof, then and in such case this deed to be void, but otherwise to remain in full force and virtue."

The premises embraced in this mortgage had been previously on the same day released by the respondents to Robbins & Lawrence to enable them to make the mortgage, the legal title to the same having been at the time in the respondents under a provision of the contract of January 9, 1852, between themselves and Robbins & Lawrence, by which they were to hold it as security for the performance of that contract and with a right to purchase at an appraisal under certain conditions. That contract is given in part, *ante* Vol. 31, p. 4, and in full, *ante* Vol. 29, p. 284. The vote by which the respondents (who are a corporation) authorized the president of the company to execute a release of the land in question, is given in full, *ante* Vol. 31, p. 6. It was found that Fox, Henderson & Co. took their 'mortgage with knowledge of the terms

of this vote, as well as with knowledge of the contract of January 9, 1852.

As the vote authorized the release only for the purpose of enabling Robbins & Lawrence to secure the performance of the contract referred to in it, and provided for a reconveyance of the property when the contract should be performed, it was contended by the counsel for the respondents that they stood in the position of sureties, and that the property was discharged by certain changes made in the contract by Fox, Henderson & Co. and Robbins & Lawrence. That this part of the case may be understood, it will be necessary to set out the original contract, and two supplemental contracts by which the changes were made, which were not given in the former report of the case.

The original contract was made on the 8th of March, 1855, between Fox, Henderson & Co. and the Robbins & Lawrence Company—the latter a corporation located at Windsor in the state of Vermont, the greater part of the capital stock of which was owned by Robbins & Lawrence. It was as follows :—

" These articles of agreement, made this 8th day of March, 1855, between the Robbins & Lawrence Company, manufacturers at Windsor in the state of Vermont and United States of America, parties of the first part, and Fox, Henderson & Company, of 8 New street, Spring Garden, London, parties of the second part, witness :—That the parties of the first part, in consideration of the agreements of the parties of the second part, hereinafter contained, agree with all possible dispatch to proceed to manufacture and to complete, finish and deliver in such place in the cities of New York or Boston as the parties of the second part or their agent may designate, twenty-five thousand Minie rifles, with bayonets and appurtenances complete, packed in sufficient and proper boxes, which rifles are to be in all respects similar, and equal in quality, detail and finish, to the pattern rifle exhibited and delivered to the parties of the first part for the purposes of this agreement, and that such rifles shall each and every of them be subject when so delivered to the inspection, approval and

certificate of Captain J. P. Warlow, or such other competent person as the parties of the second part may appoint to act in their behalf. And the said parties of the second part agree to purchase the said rifles when so completed, delivered and certified, and to pay therefor the sum of $15.50 for each rifle and bayonet complete in manner hereinafter mentioned. And the said parties of the second part further agree to advance to the parties of the first part the sum of twenty thousand pounds sterling, payable at London, and at the following periods, upon the drafts of the parties of the first part at sixty days sight, in the following sums :—Five thousand pounds to be drawn for upon the execution of this contract, and two thousand pounds at the end of each seven days thereafter until the twenty thousand pounds is paid and advanced. Provided, however, that the parties of the second part may discontinue further advances in case it shall be certified to them by Charles St. John, their agent, that the parties of the first part have failed to make satisfactory progress in the execution of this contract. Interest shall be allowed the parties of the second part on such advances at and after the rate of six per cent. per annum, and such advances are to be repaid by a deduction of four dollars per rifle on each delivery at New York or Boston, according to the terms of this agreement. And the parties of the second part further agree that they will pay the difference between the said advance of four dollars per rifle with interest to be made as aforesaid, upon the drafts of the parties of the first part upon them the parties of the second part at London, payable at sixty days sight, for the amount of each delivery of such rifles at the cities of New York or Boston, properly boxed, accepted and certified as aforesaid, and that upon the receipt of any certificate or certificates of the delivery and approval by the person appointed for that purpose as aforesaid, they will accept in due course drafts for the balance of the amount of such deliveries after deducting the advance of four dollars per rifle and interest as above provided. Differences of sterling exchange to be adjusted to federal currency and allowed in settlement. In

witness whereof, the said parties have hereunto set their hands the day and year first above written."

The next contract was made on the 11th of December, 1855, at the same time with the execution of the release by the president of the respondents to Robbins & Lawrence and the execution of the mortgage by Robbins & Lawrence to Fox, Henderson & Co. Robbins & Lawrence by this contract for the first time became parties to the undertaking to manufacture the 25,000 Minie rifles for Fox, Henderson & Co. As to this contract it was found by the committee that the respondents knew at the time the mortgage was given to Fox, Henderson & Co. that Robbins & Lawrence and the Robbins & Lawrence Company were making further securities to Fox, Henderson & Co. for their advancements and the fulfillment of their contract, and were mortgaging the premises released to them by the respondents, but had no further knowledge of the details of said securities and arrangements. The contract was as follows :—

" Memorandum of agreement made this eleventh day of December, 1855, between Samuel E. Robbins and Richard S. Lawrence, both of Hartford in the state of Connecticut, of the first part ; the Robbins & Lawrence Company, manufacturers at Windsor in the state of Vermont, of the second part ; and Messrs. Fox, Henderson & Company, of London in England, of the third part :

" Whereas, on or as of the 8th day of March now last past, the parties hereto of the second part entered into a written contract with the parties hereto of the third part, for the manufacture and sale to them, the said parties hereto of the third part, of twenty-five thousand Minie rifles, in the manner and on the terms in said contract specified, which contract is still pending and only partially performed; And whereas the said parties of the first part are the principal members of and largely interested in said Robbins & Lawrence Company, and have taken upon themselves a large portion of the work to be done under said contract, and carry on said work at their private manufactory in Hartford aforesaid ; And whereas, the parties of the third part, having made large advances

under said contract which remain unpaid, and being about to make further advances thereon, have required security therefor, and the parties hereto of the first part, at the request and with the assent of the parties hereto of the second part, have agreed to become such security, and accordingly by deed, bearing even date herewith, have mortgaged to the parties of the third part their manufactory at Hartford aforesaid, with the machinery and tools therein, for securing such advances respectively, as appears by the said mortgage on record at Hartford aforesaid ; and they the said parties of the first and second parts have also agreed to enter into such further stipulations as are hereinafter contained :—Now these presents witness, that in consideration of the premises and of the said sums so advanced and to be advanced by the parties of the third part as aforesaid, they the said parties of the first part, with the assent and at the request of the said parties of the second part, testified by their execution hereof, do hereby personally and individually agree, and do hereby personally and individually bind themselves, to and with the parties of the third part, for the due fulfillment of the aforesaid contract and of this agreement by the parties hereto of the first and second parts respectively. And they, the said parties hereto of the first and second parts, do hereby respectively further agree and further bind themselves to and with the parties of the third part, that they, the said parties hereto of the first and second parts respectively, shall not, nor will, pending the pendency and until the complete fulfillment of the aforesaid contract, manufacture or deliver Minie rifles for or to any person or persons other than the parties hereto of the third part, (except only work done and condemned under the aforesaid contract, and which it is agreed may be made up and sold by them,) or use the machinery or tools now in use for manufacturing such rifles for any other purpose than the manufacture and delivery of rifles under said contract. And they the said parties hereto of the first and second parts do hereby further agree and further bind themselves to and with the parties of the third part, that independent of the deduction of four dollars on each rifle to be made under the aforesaid

Rowan v. Sharps' Rifle Manufacturing Company.

contract according to the terms thereof, a further deduction of one dollar per rifle on each delivery to be hereafter made under the said contract according to the terms thereof, shall henceforth be made by them the said parties of the first and second parts, until all advances made to them by the parties of the third part under the said contract or otherwise, with interest thereon at the rate of six per cent. per annum from the date of such advances respectively, shall be fully paid and satisfied. And they the said parties of the first and second parts do hereby respectively further agree and bind themselves to and with the said parties of the third part, that from and after the date of these presents, they, the said parties hereto of the first and second parts, shall and will respectively complete and deliver to said parties of the third part, an average of at least three hundred rifles per week up to the fifteenth day of January next inclusive, and an average of at least six hundred rifles per week for each succeeding week during which the said contract shall be pending and until the full completion thereof; and further, that from and after the 20th day of December instant, and in order to such completion at the earliest practicable period, they, the said parties of the first and second parts respectively, will thenceforth carry on by night work as well as by day work, all works under said contract which can be performed at night; and also that said Richard S. Lawrence shall take upon himself the active management of the mechanical department of the works under said contract, both at Windsor and Hartford aforesaid, and shall devote his entire time and attention thereto. In witness whereof, the said parties have hereunto set their hands, the day and year first above written."

A further agreement by the same parties was entered into on the 14th day of January, 1856, the material parts of which are as follows:—

"Whereas, since the execution of a certain other agreement between the said parties hereto, bearing date the 11th day of December, in the year 1855, the parties hereto of the third part have made to the parties hereto of the first and second parts, under the powers in the said agreement con-

tained, the following further advances, to wit, the sum of six thousand dollars on the first day of January instant, and the further sum of thirty thousand dollars on or as of the date of this agreement, in consideration whereof the said parties hereto of the first and second parts have agreed to enter into such further stipulation with the parties of the third part, in relation to the contracts now pending between them, as in the aforesaid agreement mentioned or referred to, as are hereinafter expressed. Now these presents witness, and the said parties of the first and second parts hereby respectively further agree with the said parties of the third part, as follows, to wit: that all the locks of the rifles to be manufactured under the aforesaid contracts shall be put up and viewed at Hartford, and not at Windsor as heretofore, and that all parts of such locks and all other portions of said rifles shall, as soon as the same shall have been viewed, or whenever otherwise required by the said parties of the third part, be from time to time forthwith transmitted to Windsor from Hartford as aforesaid; that from and after the first day of February now next ensuing, at least six hundred and fifty rifles shall be delivered, completely finished according to the terms of the said now pending contracts, in each and every week thenceforth, until the same contracts shall be respectively carried out and performed; that in case of any default by the parties of the first and second parts in performance of the stipulations of the aforesaid pending contracts or of this agreement, they, the said parties of the first and second parts respectively, bind themselves to make such changes in their works and to employ such additional workmen as the said parties of the third part may from time to time require, and generally to carry on said works under the supervision and to the satisfaction of them the said parties of the third part; and in default thereof they the said parties of the third part are to be at liberty, if they shall so think fit, to procure any deficient portions of the works under the said contract to be made by other persons, and to charge them, the said parties of the first and second parts, with the expense so occasioned as last aforesaid. Further deductions of one dollar on each rifle

from the tenth to the sixteenth thousand of the rifles to be delivered under the aforesaid contract, and of four dollars on every such rifle so delivered from the sixteenth to the twenty-fifth thousand, shall be respectively made from time to time by the parties of the first and second parts, in addition to the deductions already stipulated to be made by the aforesaid pending contracts, for the purpose of repaying the additional advances made as herein recited; and all and singular deductions to be made under the aforesaid pending contracts or this agreement or any of them, are from time to time to be applied in the first instance in liquidation of the said advance of thirty thousand dollars made on or as of the date of this agreement, as herein before recited, and afterwards in liquidation of all prior advances under the same contracts, or any of them, until the same shall be respectively fully repaid."

The committee found that the contracts of the 11th of December, 1855, and of the 14th of January, 1856, were entered into for the purpose of securing the performance of the contract of March 8, 1855; and that neither the petitioner, nor the British government, nor Fox, Henderson & Co., had any knowledge that the respondents claimed the rights of sureties as to the real estate released by them, except such knowledge as the law will infer from knowledge of the vote of December 11, 1855, and of the relation of the respondents to the real estate prior to the vote.

The committee also found that soon after the 11th day of December, 1855, Robbins & Lawrence and the Robbins & Lawrence Company were in want of further funds to enable them to go on with the manufacture of rifles under their contracts of March 8, and December 11, 1855, and were greatly embarrassed for want of such funds, and in danger of being compelled to suspend their work; that Fox, Henderson & Co. did thereupon, and upon the urgent solicitation of Robbins & Lawrence and the Robbins & Lawrence Co., make to them on the first day of January, 1856, a further advance of six thousand dollars, and on the 14th of January a further advance of thirty thousand dollars, for which Robbins & Lawrence gave their promissory notes; and that these advances

were made to enable Robbins & Lawrence and the Robbins & Lawrence Company to carry on the manufacture of the rifles and to perform the contracts, and were necessary for that purpose, and were made by Fox, Henderson & Co. solely under that necessity and for that purpose. These advances are the same that are mentioned in the contract of January 14, 1856.

The committee further found that neither the contract of the 8th of March, 1855, nor that of the 11th of December, 1855, nor that of the 14th of January, 1856, had ever been fully performed by Robbins & Lawrence, or by the Robbins & Lawrence Company, nor had the several sums of money advanced by Fox, Henderson & Co. ever been fully repaid to them or to the petitioner ; that on the 28th of October, 1856, Robbins & Lawrence failed in business, and became and had since continued to be insolvent; that a few days before, the Robbins & Lawrence Company also failed, and became and had since continued to be insolvent; that the failure on the part of both to fulfill their three contracts with Fox, Henderson & Co. was owing chiefly to the want of adequate pecuniary means for carrying on the manufacture of arms to the extent to which they had undertaken it; and that on the 3d day of November, 1856, there were in arrears and undelivered upon said contracts, 14,600 rifles ; that on the 4th of November, 1856, Fox, Henderson & Co. by an instrument in writing assigned to the petitioner all their rights and claims of every kind under the three contracts, and all the mortgage interest and security held by them, and conveyed to the petitioner all their right and interest in all the property described in the mortgage deed ; and that the petitioner received the assignment and conveyance as trustee for the British Government, and still held the same as such trustee, and was prosecuting this suit for the use and benefit of the British Government ; that the petitioner brought an action of ejectment against a party in possession of the real estate under a conveyance from Robbins & Lawrence, in which he recovered judgment at the July term of the superior court for Hartford county, in the year 1859, and was put into possession of the

same upon the execution issued upon the judgment, and has ever since held exclusive possession of the same ; that there was due to the petitioner on the first of September, 1861, on account of the advances on the contracts, the sum of $104,501.54 ; that Fox, Henderson & Co. and the petitioner claimed the right, by virtue of the contracts of December 11, 1855, and of January 14, 1856, to apply the various deductions provided for in those contracts, first to the payment of the advancements made by Fox, Henderson & Co. subsequent to the 11th of December, 1855, and did in fact so apply them; and if the court should be of opinion that they had a right to make such application, that then the whole of the advancements made subsequent to the 11th of December, 1855, were repaid, and that the sum of $104,501.54 was the balance remaining unpaid of the original advancement of $130,000 ; but if the court should be of opinion that they had no right to make such application, that then $84,082.45 was the balance remaining unpaid of the original advancement, and that $20,419.09 was the balance remaining unpaid of the other advancements made subsequent to the 11th of December, 1855.

It was also found by the committee that the balance due to the respondents from Robbins & Lawrence, on the advances made to them and secured by the mortgage of September 22, 1853, was $174.30.

Upon the facts found in the original and supplemental reports, the case was reserved for the advice of this court.

It was argued at the September term, 1864, in Hartford county, by *T. C. Perkins* and *Chamberlin*, for the petitioner, and *Hubbard* and *Cone*, for the respondents. After holding the case for some time under advisement, the judges ordered a re-argument upon certain points, the following statement of which was prepared by them.

*First.* Assuming that Sharps' Rifle Company held the land in question as security : 1st, for the performance of the contract of January 9th, 1852, in respect to the manufacture of rifles and repayment of advances ; 2d, for the fulfillment of the conditions of the mortgage of September 22d, 1853 ; and 3d, to enforce an optional right of purchase :

And assuming that the vote of Sharps' Rifle Company, and other circumstances attending the release of their interest, rebut the ordinary presumption of an absolute release, and show a special intention to release to enable Robbins & Lawrence to secure a particular specific contract, and for that purpose only, and provide for a reconveyance when that purpose was effected; and therefore that when Fox, Henderson & Co. rendered the performance of that particular contract impossible by changes in its conditions, and its rescission and abandonment, Sharps' Company were equitably entitled to be reinstated in their rights :

And assuming further that, under a proper cross-bill, the court would be bound either to treat them as restored to their rights, or decree a restoration of them :

Is it not nevertheless true that the court can not so hold or decree unless those rights still exist in Sharps' company ?

And is it not true—

1st. That their released rights under the contract of 1852, so far as they related to the manufacture of twenty thousand rifles, and any advancements of money under it, are all satisfied by the subsequent settlement and payments made between the parties, or abandoned by the abandonment of that contract, and disposed of by the supplementary finding of the committee, that Sharps' Company have no existing claim for damages for its non-fulfillment, and that therefore, that right being wholly gone, the court is precluded from making it the basis of any action whatever ?

And true, 2d, that their rights under the mortgage of September, 1853, are reduced by settlement and payment, and a conclusive finding, to a right to have that mortgage considered as existing, in preference, for the payment of the ascertained balance of $174\frac{30}{100}$ and nothing more ?

And true, 3d, that if the right to purchase is still an existent right, Sharps' Company do not claim in their cross-bill, or before us on argument, that they desire or intend to exercise it ? And can we, under such circumstances, make that right of purchase the basis of any action in favor of Sharps'

Company, and on that account hold or decree the title back in them ?

Is there then any released right, now existent and insisted upon, and intended to be exercised, which requires or will permit us to hold or decree back in Sharps' Company that legal title which they acquired by virtue of the contract of January 9, 1852 ? Or any right which we can regard, except that of security for the sum of $174.30 under the mortgage of 1853 ? And if not, how can we hold or decree a restoration of any title acquired under the contract of 1852 ?

*Second.* Assuming it to be true that if Sharps' Company were reinvested with all the title held before the release, they would have a lien for all damages accruing by reason of the non-fulfillment of the contract of January 9th, 1852, is it or can it be true, that they would or could have any like lien for the independent debt due from the British Government, and therefore have a right to be so reinvested because of that debt ?

*Third.* Assuming that in relation to the mortgage right of security for $174.30, the petitioner must redeem, is not the respondents' cross-bill so framed that we can and should advise a decree of foreclosure in their favor for that amount ?

*Fourth.* Assuming it to be true that the respondents have a valid but independent claim against the British Government—that they are our own citizens—that the British Government own, in fact, the land in question, and have no other property in our jurisdiction—that it is doubtful whether an original action at law in favor of the respondents will lie to appropriate it, and clear that if it will, the title being in Rowan, a resort to equity must ultimately be had to perfect the title—that the British Government are *pro hac vice* embodied in the person of the petitioner as ordinary suitors, and in court, making answer to the cross-bill in respect to their rights in the property, and as to that property are subject to our own decree—may we not advise the superior court, in order to prevent a failure of justice, and in accordance with the doctrine that every man's property shall be made available to pay his debts, that, on an amended cross-bill, a sale of the property and a payment of the debt by the respon-

dents therefrom may be ordered? Or may we not advise the superior court that, upon an amended cross-bill, it will be competent for them, if they find a right of purchase in Sharps' Rifle Company, to provide for an appraisal, and decree the title, applying the debt due from the British Government in payment? And would not one or the other of the latter alternatives be equitable and just?

*Fifth.* Must not our decision therefore be, either to advise a decree in favor of the respondents of foreclosure, predicated on the balance of $174.30, or to dismiss the bill, unless some further ground of relief should be presented by an amendment of the cross-bill?

*T. C. Perkins* and *Chamberlin,* with whom were *H. Whittaker* of New York, and *Hooker,* for the petitioner.

*Hubbard* and *Cone,* for the respondents.

HINMAN, C. H. When this cause was before us on a former occasion (31 Conn., 1,) we held that the decree of the superior court foreclosing the right of the petitioner and of the government of Great Britain, unless they should pay for the use of the respondents a large sum of money, found to be the loss and damage sustained by the respondents by reason of the acts and defaults of the agents of the British Government in respect to a contract between that government and the respondents, which was wholly separate and independent of the contracts upon which this petition is founded, and on failure of such payment authorizing the respondents to redeem the premises sought by the petitioner to be foreclosed, and to become the owners thereof in fee, by the application and set-off of so much of said loss and damage as amounted to the sum of $33,000, found to be the value of the mortgaged premises ; and further decreeing that on the failure of the petitioner or the British Government to pay such loss and damage, such application and set-off should be deemed to have been made and assented to, without any further act on the part of the respondents, and the title of the respondents

Rowan *v.* Sharps' Rifle Manufacturing Company.

to the premises should thereafter be absolute as an indefeasible estate in fee simple, was erroneous, because the respondents had not alleged that they had taken or elected to take the premises under the contract by virtue of which they claimed a right thus to appropriate the property, and because they had not shown any attempt or intention so to take the property, but the contrary was expressly found by the committee ; and because also they had no right to take the premises but in a mode prescribed by the contract under which they claimed to exercise this right, especially in respect to the fixing of the value thereof, and which mode had not been pursued.

The case now comes before us for our advice as to the proper decree to be passed upon the same state of facts which was then before the court, with a slight variation in one or two particulars, which are not material to the questions involved in it; and there is also a question as to the admissibility of certain evidence before the committee on the supplemental hearing, which upon the view we have taken upon the merits of the case it is unnecessary to decide. The case is important in respect to the amount involved, and is so extremely complicated in its facts that we have, after hearing it twice argued, felt the necessity of devoting much time to a careful examination of it,which has caused much more delay in the decision of the case than would otherwise have been necessary ; and we have to regret also that we have not at last been able to arrive unanimously at the conclusion which is now to be expressed, on all the points involved in the case.

One of the questions in the case is, whether the release or quitclaim deed executed by the respondents on the 11th of December, 1855, in pursuance of their vote for that purpose, to Robbins & Lawrence, to enable them to make satisfactory security to Fox, Henderson & Co. for the $130,000 advanced on the contract of the Robbins & Lawrence Company to manufacture 25,000 Minie rifles, together with the mortgage of Robbins & Lawrence to Fox, Henderson and Company of the property so released, and the circumstances under which the respondents were induced to pass that vote and execute the

release, made the respondents, so far as their previous interest in the property thus released is concerned, sureties for the due performance, by the Robbins & Lawrence Co. or by Robbins & Lawrence, of the contract of the 8th of March, 1855, for the manufacture of the 25,000 rifles. And we are of opinion that, in respect to the interest conveyed by this quitclaim deed, the respondents were sureties for the due performance of that contract. That one may become the surety for the payment of another's debt or the performance of his contract by mortgaging his land or pledging his property for that purpose, as well as by coming under a personal liability for the same purpose, seems to be a proposition too plain for illustration or argument. The liability to be subjected to loss, to the extent of the property pledged or mortgaged, is as great at least as if the party was under a personal obligation; and if his property is eventually subjected to the payment of another's debt, at whose request and for whose benefit he thus pledged it, his right to an indemnity would seem to stand on the same footing as it would have done had his obligation been personal. And this has long been held to be so in that class of cases where a wife pledges or mortgages her separate estate for the debts or liabilities of her husband. After the death of her husband she is justly considered in equity as a creditor of the husband's estate, and entitled to have his assets applied in discharge and satisfaction of claims thus secured in order that the lien upon her separate estate may be discharged. The court, it is said. in such cases looks upon him as the real debtor, and on her land or other estate as only additional security. See the cases on this subject collected in Clancy on Husband and Wife, Book 5, Chap. 12. And the same doctrine is held in this country as in England. *Neimcewicz v. Gahn*, 3 Paige, 614, and 11 Wend., 318. In Connecticut it does not appear that our courts have ever had occasion to act upon this principle, and yet it is so obviously just that Judge Storrs, in *Ayers v. Husted*, 15 Conn., 517, speaks of a wife's land, as standing in the relation of surety in that transaction, seeming to regard the principle as a well understood and recognized one. And the reason of this principle

certainly applies with equal force to the case of a stranger who mortgages his property for his friend's debt, and has accordingly been recognized. *Robinson* v. *Gee*, 1 Ves. Sen., 251; *Lord Harberton* v. *Bennett*, Beatty Ch. R., 386; *Loomer* v. *Wheelwright*, 3 Sandf. Ch. R., 155. Indeed the doubt we have entertained on this point has not arisen from any question as to the correctness of the principle itself, but it has been merely as to the application of it to the facts in the case. To enable a party to take the benefit of the principle it should doubtless appear that the property pledged or mortgaged for another's debt was in fact the property of the party so pledging or mortgaging it. If he merely relinquishes some lien he may have upon property to enable the real owner to mortgage or pledge it for the security of such owner's own debt, no one would claim that such a release would render the releasor a surety in any sense of the mortgagor; and the petitioner's counsel insist that this is a case of that sort. We have come to a different conclusion. Generally everything which is the subject of sale or assignment may be mortgaged or pledged, since a mortgage is only a conditional sale. Hence it follows that a mortgage, including of course the debt secured by it, may itself be the subject of assignment as security for another's debt. The situation of the respondents' title to this property was peculiar. They held the legal title by an absolute conveyance, which, though but a mortgage for the purpose of securing the performance of the contract by virtue of which it was conveyed to them, was, so far as strangers to the title, who had no other knowledge of it than such as the record of their deed conveyed, an absolute and indefeasible estate, and strangers no doubt might safely have dealt with them upon that supposition. As between the parties however, it was merely a mortgage with an optional right of purchase upon certain terms, and this right was secured to them by their absolute deed, as we held when this case was before us on the former occasion. Now had the respondents been willing to surrender their optional right of purchase, and give up their mortgage interest in this property absolutely for the purpose of enabling Robbins &

Lawrence to use it as their own, either to raise money upon it by way of mortgage, or to make satisfactory security to Fox, Henderson & Co., and without any stipulations in respect to their own rights or any attempt to preserve them, their claims upon the property would have been extinguished by their release, and they could not have recalled them, either against Robbins & Lawrence or the petitioner. But by the vote of the company, which was made known to Fox, Henderson & Co., and which was passed at the joint solicitation of all the parties then having any interest in the security, and the terms of which were made known to them all, it appears clearly to have been the intention of the respondents to preserve their rights to the property released, subject only to the contemplated mortgage to Fox, Henderson & Co. Now this intention being known to all the parties, and particularly known to the mortgagees at the time they took their mortgage, and the mortgagees knowing moreover that the respondents had valuable interests which they intended to preserve in the property, and that the conveyance was made, not to secure their own debt or liability, but the liability of the Robbins & Lawrence Co., for whom the respondents were mere sureties in this transaction, Fox, Henderson & Co. the mortgagees must be presumed to have recognized this intention and assented to it, and intended to carry it out in good faith. This intention ought to be carried out provided it can be done consistently with established rules, and it appears to us that this can be done. The whole transaction taken together may be treated as an assignment of such portion of their mortgage debt or claim against Robbins & Lawrence as this portion of the property mortgaged to secure it bears to the whole of the property claimed by the respondents under the same title. Indeed, under the circumstances, this seems to be a fair inference of the intention of the parties, and therefore as properly coming under the maxim requiring a liberal construction upon instruments in order to uphold them if possible, and carry into effect the intentions of parties. If this had been done by a proper instrument of assignment of the debt or claim, or some portion of it, together with the

Rowan *v.* Sharps' Rifle Manufacturing Company.

conveyance of the mortgaged security, no one would doubt that, so far as the interest thus assigned was concerned, the respondents would stand in the position of sureties of Robbins & Lawrence in respect to the contract intended to be secured thereby, and as such would be entitled to the rights of sureties in respect to any subsequent transactions between Robbins & Lawrence and Fox, Henderson & Co. or their assignees. The fact that such an assignment must carry with it a portion of the mortgage debt in order to support the conveyance of the land ought not to be permitted to defeat the obvious intention of the parties. Equity looks at the real intention and object rather than to forms, and will always carry out that intention if it can be done consistently with established rules.

It appears to us, therefore, that the respondents, in respect to the interest conveyed by their quitclaim deed to Robbins & Lawrence, under the vote which authorized it, must be regarded in the nature of sureties for the performance of the contract intended to be secured to Fox, Henderson & Co. by the mortgage deed of the same property, under which the petitioner now claims a foreclosure against the respondents. What then is the effect of the subsequent alterations and changes in the contract thus secured, made by the parties thereto after the execution of this mortgage? It is said in the text-books that any binding stipulations between creditor and debtor, not communicated to the surety, which are inconsistent with the terms of the contract, or which are prejudicial to his rights therein, will operate as a discharge of the surety, and any act inconsistent with the rights of a surety, if not assented to by him, will discharge his contract. And on this ground it is held that any new contract between creditor and debtor, without it is assented to by the surety, which is inconsistent with the original contract, will operate to discharge the surety.

We have none of us any doubt that within the spirit of these well known principles some of the alterations and changes in the contract of March 8th, 1855, for the manufacture of the 25,000 Minie rifles, were such as to discharge an

ordinary surety for the performance of that contract.    There
were many changes in that contract without the knowledge or
consent of the surety.    But it is wholly unnecessary to allude
to more than one or two of them, since one such material and
binding change in the terms of the contract is as effective for
this purpose as any number of such changes.    We have said
that it was the contract for the manufacture of 25,000 Minie
rifles that was secured by the mortgage of Robbins & Law-
rence, and of course it follows that it is that contract that
the respondents secured, or enabled the mortgagors to secure,
by the quitclaim deed given to the mortgagors for that pur-
pose.    The condition of the mortgage deed shows this; for
while it speaks of the repayment of the $130,000 then and
before advanced to Robbins & Lawrence, it goes on to show
that the money was not advanced as a loan, but as prepay-
ment for the rifles to be manufactured; and the repayment
was to be effected pursuant to the terms of the contract to
manufacture them, by a deduction from time to time, as the
rifles were delivered, of a portion of the contract price for the
rifles as so delivered.    And the condition of the deed ex-
pressly provides that the contract should be duly performed
in all respects, or the deed would become absolute.    It was
therefore only in case of the non-performance of that contract
that there was to be any repayment of the advancements in
money.    And it was for the purpose of enabling Robbins &
Lawrence to make this satisfactory security for the perform-
ance of that contract, and the repayment of the money in case
of its non-performance, that the respondents executed the quit-
claim deed, and not primarily for the repayment thereof in
cash.

   Then were the terms of that contract materially changed
after the giving of this security for the performance of it?
The original contract provided for the manufacture and
delivery, " with all possible dispatch," of these 25,000 rifles.
By this stipulation it was doubtless understood that they
should be made and delivered within a reasonable time.    We
are not aware that any question is made by the petitioner as
to this being the true meaning of this phrase; and there cer-

tainly appears to be no material distinction between it and a contract by a manufacturer to furnish certain goods " as soon as possible " which was held to mean within a reasonable time in the case of *Attwood* v. *Emery*, 38 Eng. Law & Eq. R., 176.

Now by a subsequent contract between Robbins & Lawrence and Fox, Henderson & Co., but made on the same day on which the mortgage in question was given, this stipulation was so changed that the Robbins & Lawrence Co. and Robbins & Lawrence agreed that from and after that date they would complete and deliver an average of at least 300 rifles per week up to the 15th of January then next, and an average of at least 600 per week for each succeeding week during which the contract should be pending, and that after the 20th of December, then instant, in order to such completion at the earliest practicable period, they would carry on by night as well as by day all works under said contract which could be performed at night. Now we do not stop to inquire whether these changes, as suggested by the petitioner's counsel, might not have been for the benefit of the surety. It is enough, we are satisfied, that they were material changes which destroyed the identity of the contract secured, and clearly justified the surety in saying that he never became surety for the performance of the substituted contract. *Manufacturers' Bank* v. *Cole*, 39 Maine, 188; *Samuell* v. *Howarth*, 3 Merivale, 272.

It was insisted upon by counsel that these changes of the time of delivery were only a specification by the parties of what in their view was a reasonable time for such delivery. We do not think so. But if this should be assumed it would be necessary to go still further and hold that the subsequent alteration in this respect made on the 14th of January, 1856, by which it was still further stipulated that after the first day of February then next, 650 rifles, completely finished, should be delivered each week, was a still further specification of what the parties at that time considered a reasonable number to be delivered weekly. But it appears to us very clear that a contract to manufacture and deliver a large quantity of any description of goods in a reasonable time, and a contract to

manufacture and deliver the same quantity either at a specified time for the whole, or a specific quantity from time to time, monthly or weekly, as the case may be, are materially variant.

Another material alteration of the original contract which the parties made by the contract of December 11th, 1855, was that Fox, Henderson & Co. were to retain from the price of each rifle to be delivered under the original contract, five dollars instead of four, as provided for in the original contract. This one dollar on the whole number of rifles to be delivered might have been the means of enabling the Robbins & Lawrence Co. or Robbins & Lawrence, to complete their contract and thus have saved the surety harmless. And as the respondents pledged their property for the performance of the contract as it originally stood, it might also have been the inducement, and doubtless was to some extent an inducement to them, to part with their interest in the mortgaged premises in order to enable Robbins & Lawrence to mortgage them. These, with several other alterations of the original contract which we do not think it necessary particularly to allude to, made material changes in the original contract, the effect of which was to destroy its identity, and in equity discharge the respondents' liability as surety. And as there is no difference between a contract secured by the personal obligation of the surety and one secured by the pledge of his property, in respect to the acts of the parties to it which will exonerate the surety, we have no doubt, as already remarked, that in equity the surety was discharged in this case, so far as the interest in the property conveyed by the quitclaim deed is concerned.

We are brought now to the effect which the discharge of the respondents' interest in the mortgaged premises from any liability to pay the mortgage debt, so far as the respondents are concerned, has upon the result of this case. The legal title to the premises was undoubtedly passed to Fox, Henderson & Co. by that mortgage ; and whatever may be the nature of such a title elsewhere, with us it may without doubt give to the party holding it, even in a court of equity, an import-

ant advantage which he would not otherwise possess, since it is a well settled rule that where the equities are equal the legal title will prevail. *Smith* v. *Vincent,* 15 Conn., 1 ; *Gregory* v. *Savage,* 32 id., 250. Robbins & Lawrence, by the quitclaim deed of the respondents, became for the time the absolute owners in fee simple of this property. There were no other persons at that time who had any interest whatever in it. And this title of course passed to Fox, Henderson & Co. by the mortgage to them. And this leads to the remark that the contest in this case is in reality what is sometimes called a scramble, between creditors of the hopelessly insolvent corporation of the Robbins & Lawrence Co. and some of its equally insolvent shareholders, for what there is left of the property of these insolvent debtors. It is quite obvious that both parties are in danger of losing some portion of their respective claims. In a general sense, therefore, the equities between the parties are precisely equal, since to give a preference to either of them implies the absurdity of making a distinction between creditors of the same insolvents in respect to their respective rights to the payment of their debts. Who then has the better title to the property in dispute ? The petitioner seeks to foreclose the respondents' interest in the premises. But as against them he has no equity, because those under whom he claims have so altered the contract that was secured by the original mortgage as to destroy it, as a security for the contract it was intended to secure. His bill of foreclosure should therefore be dismissed, or be postponed to such decree as may be rendered in favor of the respondents upon their cross-bill. What interest in the property have the respondents set up in their cross-bill and established by their proof ? Originally they had, as we held when the case was before us on the former occasion, (31 Conn., 1,) a mortgage interest with an optional right to purchase, in a mode prescribed by the parties in the contract by which this right was created. And by the terms of their vote under which they parted with these interests to Robbins & Lawrence, they were to have from Robbins & Lawrence a mortgage to secure their indebtedness, subsequent to and subject to the petitioner's

mortgage. This mortgage, though never executed in fact, it is agreed should be treated as if it had been. And the respondents having parted with their title, such as it was, as the sureties of Robbins & Lawrence for the due performance of the contract of March 8th, 1855, and the alterations in the terms of that contract operating to discharge this suretyship, the effect is simply to postpone the petitioner's mortgage to the mortgages of the respondents. But the respondents having no absolute title, but in equity a mortgage title only, coupled with their independent right to purchase, (which right however it does not appear that they intend to exercise, and it need not therefore be noticed in this connection,) the effect as we think is to postpone the petitioner's mortgage to the mortgage that was to have been executed to the respondents, as well as to their previously executed mortgage interests. But as the respondents' last mortgage was to have been executed on the 11th of December, 1855, it can only stand as a security for the indebtedness of Robbins & Lawrence to them at that time. And as Robbins & Lawrence had an ultimate equity of redemption, which passed to the petitioner's assignors, by the mortgage executed on the 11th of December, 1855, and as this was a good mortgage as against Robbins & Lawrence, though inoperative as against the respondents in consequence of subsequent acts, the respondents regularly are entitled to a decree of foreclosure against the petitioner, unless he pays whatever is due the respondents from Robbins & Lawrence of the indebtedness which existed on the 11th of December, 1855. The amount of this mortgage debt still remaining due to the respondents is found by the committee to be so small that the respondents, probably fearing that a decree in their favor foreclosing the petitioner unless that debt is paid may be prejudicial to them in other respects, specially disclaim any intention to take a decree of foreclosure for that sum alone, and express a preference rather for the dismissal of both the bill and cross-bill ; and the court therefore would not undertake to advise the superior court to grant them this measure of relief, if they continue to refuse to accept it ; unless, as jurisdiction of the cross-bill has been

Rowan *v.* Sharps' Rifle Manufacturing Company.

obtained by the court, it may be 'necessary in order to do complete justice in the case that such a decree should be made.

It is suggested by the counsel for the petitioner that the small balance of the mortgage debt to the respondents is not secured by the mortgage of September, 1853, but only by the new mortgage which was to have been executed after the mortgage under which the petitioner claims, because the mortgage debt was to be secured, it is said, solely by that contemplated mortgage, and not by the reconveyance provided for by the vote of December, 1855, which reconveyance, it is claimed, referred solely to the performance of the contract of January 9, 1852, and the title acquired under that contract. Such a construction may no doubt be given by adhering literally to the language of the vote. Still we can not doubt that the intention was to restore to the respondents all their rights, whether arising under the contract of 1852 or the mortgage of September, 1853. Their rights were of the same nature under both of these instruments, except in respect to the optional right of purchase; and we do not think the circumstance that they had their origin under separate instruments of any importance in respect to the reconveyance contemplated on the performance of the contract for the manufacture of the 25,000 rifles. The respondents, we think, stand in the condition of sureties in respect to the whole mortgage debt or liability, however arising, previous to their release.

The views which we have thus far expressed are in accordance with those which were intimated in our statement of the points on which we wished a re-argument; and we will only say that the very elaborate and able re-argument which we have heard has not altered our previous impressions upon them. We expressed our conviction on the first trial of this case on the motion in error that the right of purchase, if still an existing right, could not affect this case, because, among other reasons, no foundation for its exercise was laid in the allegations of the cross-bill.

We come now to the claim of the respondents for relief,

arising out of their independent claim against the British Government. That they have an equitable claim of that sort arising out of an independent contract by them with the agents of that government for the manufacture of arms, which claim amounts to more than the value of the disputed premises, as found by the committee, but is much less than the petitioner's claim against Robbins & Lawrence, there can be no doubt. Can the premises in dispute be in any way legally and equitably appropriated to the payment of that claim? The respondents' counsel insist that they can be. They say that the petitioner's bill is a bill to redeem, in substance, and must be so, because it is found that the petitioner stands only in the position of a second mortgagee, and that in order to redeem he must first do equity by paying the first mortgagee his mortgage debt, and all other legal debts which the respondents have against the petitioner, who in this case merely represents the British Government, and therefore must pay that government's debt to the respondents. We have not been able to see how this position could materially aid the respondents if it were correct. When a petitioner seeks to redeem mortgaged premises he may no doubt be denied this ordinarily equitable relief unless he will do the respondent the equity of paying also an independent debt of the mortgagee as well as the debt secured by the mortgage. And, as we suppose, this is always imposed as a condition, upon the performance of which alone the petitioner will be entitled to the relief he seeks. If he pays both debts he obtains his relief, but if he does not pay them both he takes nothing by his decree, and the rights of the parties to the premises sought to be redeemed would remain the same as if no relief had been sought. But in this case we have already disposed of the petitioner's bill by dismissing it on other grounds; and it can hardly be supposed that the petitioner, if this condition was imposed upon him here, would be willing to pay a claim so much larger than the whole value of the premises in dispute, in order to obtain a perfect title to the property. But we do not think that the petition can be turned into a bill to redeem against the wishes of the petitioner himself. The prayer for the

removal of a cloud upon the petitioner's title, if ever insisted upon for any purpose, is abandoned now, and has been ever since the case has been pending in this court, and is claimed to have been so abandoned before the facts were found by the committee. We think, therefore, that it should be treated now as a mere petition for a foreclosure. And consequently it is upon the respondents' cross-bill that they are entitled to relief if at all. We think, moreover, that the case upon the cross-bill is the same substantially as it would be upon an original bill of the respondents seeking the same or similar relief to that now claimed on the cross-bill. Now, looking at the cross-bill as an original bill for relief, it is very difficult to see, upon any ordinary equitable principles, how the respondents can be entitled to relief. It is said that the reconveyance contemplated on the performance of the contract for the manufacture of 25,000 rifles will be viewed by a court of equity as having been done when the respondents' suretyship ceased by the changes in that contract, because it ought then to have been done. That it may be so treated for certain purposes is doubtless true, but we think it a misapplication of an equitable principle to so treat it here on application of these respondents for independent relief growing out of a transaction wholly independent of any thing sought or asked for in the original bill. The legal title, as we have before said, in fact is in the petitioner, and the respondents are obliged to resort to a court of equity to obtain it. They must show, therefore, that their equity is superior to the equity of the petitioner to entitle them to relief. It appears to us that this must preclude the granting of any relief to the respondents on their cross-bill, on any ordinary equitable principles, for their independent claim on the British Government. They might, as we intimated on the former hearing of this case, be permitted to use it by way of set-off to the petitioner's claim against Robbins & Lawrence, on principles somewhat peculiar to the case, arising from the circumstance that one of the parties is a foreign government, which otherwise might be permitted to withdraw funds in the hands or from the control of the respondents which ought to be appropriated to the

payment of the debt of that government; but beyond such an application or set-off as this we are not aware that any case has gone.

The respondents make another claim which is stated in the points assigned for re-argument as follows:—

" Assuming it to be true that the respondents have a valid but independent claim against the British Government—that they are our own citizens—that the British Government own in fact the land in question, and have no other property in our jurisdiction—that it is doubtful whether an original action at law in favor of the respondents will lie to appropriate it, and clear that if it will, the title being in Rowan, a resort to equity must ultimately be had to perfect the title— that the British Government are *pro hac vicê* embodied in the person of the petitioner as ordinary suitors, and in court making answer to the cross-bill in respect to their rights in the property, and as to that property are subject to our own decree—may we not advise the superior court, in order to prevent a failure of justice, and in accordance with the doctrine that every man's property shall be made available to pay his debts, that on an amended cross-bill, a sale of the property and a payment of the debt by the respondents therefrom may be ordered ? Or may we not advise the superior court that, upon an amended cross-bill, it will be competent for them, if they find a right of purchase in Sharps' Rifle Company, to provide for an appraisal, and decree the title, applying the debt due from the British Government in payment ? "

The respondents' counsel insist that the relief suggested in this statement can and ought to be granted, and the petitioner claims that it can not be done consistently with established rules. The assumption that the claim on the British Government is an *independent* one, pre-supposes that the claim is wholly independent of any matter set up in the petitioner's bill. And the respondents' claim on the British Government we have already said is of this description. It is not a claim on this particular property, as distinguished from any other property belonging to that government which happens to be within the jurisdiction of the court, any further than this,

that the respondents have been brought before the court through the petitioner, acting on behalf of that government, in reference to a title, but an independent and distinct one, to that property. Nor do we consider the circumstance that the litigation is between our own citizens and a foreigner, or a person representing another government, of any importance in itself, in respect to the title to the property. The only importance there can be in this circumstance must arise wholly from the fact that the petitioner, or the government he represents, can in no other mode be made to pay the debt of the respondents. And the assumptions that the British Government is before the court making answer to the cross-bill, and that the property is subject to our decree, are not intended for any thing more than that the case is before us, and the property is subject to such decree as, according to the rules of a court of equity, we may consider proper to be made under the circumstances.

It being assumed that this claim against the British Government is wholly independent of the matter set up in the petitioner's bill, we think it follows that, unless there is some distinction to be made between this and a case between ordinary suitors, it is not in the aspect in which it is here presented the subject-matter of a cross-bill. All the writers on this subject speak of a cross-bill as setting up matter either touching the matter in question in the original bill or as in aid of the defense to the original bill, or, as expressed by Judge Swift in his Digest, Vol. 2d, p. 213, " as brought against the plaintiff by the defendant in a suit respecting the matter in question in that bill."

It is brought, says Judge Story, either to obtain a necessary discovery of facts in aid of the defense to the bill, or to obtain full relief to all parties touching the matters of the original bill ; and it is held that it can only be sustained on matters growing out of the original bill. *Slason* v. *Wright*, 14 Verm., 208. And we are referred to nothing contrary to this except in the single case of set-off, which we have before intimated might properly be allowed here if the respondents desire it. If this is so, and it is also true that the matter set

up in this cross-bill is wholly independent of the matter set up in the bill, and does not touch or relate to that matter, either for the purpose of defense to it, or for any disclosure relating to it, but is merely set up for the purpose of laying the foundation for some independent relief, it seems quite obvious upon authority and principle that, for the purpose of any such independent relief as is asked for, the cross-bill should be dismissed ; unless indeed the fact that the petitioner is the representative of a foreign government which owns the property in dispute, which government is indebted to the respondents, and this debt can in no way be secured or payment of it obtained except by a sequestration and appropriation of this property for that purpose, varies the case in this respect. Is there then, as the respondents claim, any such principle as this recognized by courts of equity ; and if so, is this principle so broad as that, while a party can not sue a foreign government or cite it before a court, still, when such government for any purpose appears before a court to enforce a claim of its own, the party sued may then, because he has that government in court, compel it to make answer to any matter or claim that he can establish against it and submit to any decree touching that matter or claim that the court may make ; and that such decree can be enforced by an appropriation of any property in relation to which there is a contract or controversy, notwithstanding the claim against the government is wholly foreign to and independent of the claim it is endeavoring to enforce ?

The respondents' counsel, as we understand them, claim this to be so. At least they lay down the proposition that, as the Rifle Company have a valid claim against the British Government, they have in equity a right to have this property condemned, or in some way sequestered and appropriated to the payment of the debt.

And it must have been for the purpose of sustaining this position that counsel have cited and read to us so many cases where property has been sequestered, either to compel an appearance or to punish a party for some contempt in not obeying an order or decree of the court. No doubt the pro-

Rowan *v.* Sharps' Rifle Manufacturing Company.

cess of sequestration against privileged persons to compel an appearance is sometimes resorted to in England, and we suppose that contempt in not obeying a decree of a court of equity may be enforced in this way as well as by the commitment of the party in contempt. But cases of this sort certainly have but a remote, if any, analogy to an attempt to enforce the payment of a debt against a government that can not be sued or summoned before a court, whenever for any purpose the claimant may happen to have that government as a party before the court. If this can be done against a foreign government it would seem that it might be against any of the states of the Union or even against the general government itself, and so, whenever the bond of a postmaster or other officer is put in suit, or any other debt a government has against an individual, any valid claim against the government that individual may have may be set up as a defense to the suit. A majority of us think the statement of such a proposition carries its own refutation upon the face of it, since it is believed, if it was attempted to be carried into effect in any court in this country in reference to any claim against our own government, (and there are very many such claims since our late domestic troubles,) it would seem too manifestly absurd to be met by serious argument. It is enough to say of this class of cases that they do not apply in support of the position contended for with much more force, as we conceive, than would a reference to the doctrine of outlawry as it is understood and practiced upon in England in both civil and criminal cases. The British Government are not before the court for the purpose of making answer to independent claims upon it, not growing out of or incident to the mortgage of Robbins & Lawrence to it or to Fox, Henderson & Co. for its benefit. Nor is this land before the court except for the purpose of determining the respective rights of the parties growing out of their respective mortgage or other titles to it. If the respondents have a valid claim on the British Government growing out of an independent contract for the manufacture of arms for it, the presumption is that on a proper application for that purpose the debt would be

liquidated and paid. Counsel would hardly contend that, if the respondents were the owners of enough of the recognized public debt of that government, so that the interest or principal due upon it would be sufficient to enable them to absorb the whole of this land in obtaining payment, they could obtain payment by setting it up in a cross-bill to this claim of the petitioner for a foreclosure. And yet the claim set up in this case is just as independent of the mortgage to Fox, Henderson & Co. as that would be. The only difference that we can perceive is that one would be an acknowledged and recognized liability, while the other is wholly unliquidated. But this surely makes no difference in principle in respect to the use that may be made of them for the purposes of defense against a claim which the government is attempting to enforce. There is no principle known to a court of equity which will enable a party to seize and appropriate the property of his debtor to the payment of his debt, merely because the debtor is privileged from liability to be sued. Such a process would itself be a suit, and it would be a fraud upon the privilege itself to use the appearance in court of such privileged party for another distinct purpose, as the occasion for making him respond to a claim that otherwise he would not be bound to answer. The nearest approach to such a principle that we are aware of, is in the case of a married woman who has a separate estate, and contracts debts upon the strength and credit of it, and thereby charges it with the payment of such debts. But this arises from her inability to bind herself personally. She can not make a personal contract and therefore she is allowed to supply her necessities by creating a lien upon her separate estate ; and then it follows, of course, that a court of equity will enforce a lien so created. But here the respondents claim no lien upon this property for any purpose whatever, except such as we recognize and are willing to enforce, that is to say, the lien arising from their being in fact prior mortgagees of Robbins & Lawrence. We are aware that the respondents in their brief, and in argument, speak of a lien upon this property for the payment of this independent debt, but when it is considered that the

contract out of which the respondents' debt arose was not made until March, 1856, several months after the mortgage under which the petitioner claims a foreclosure, we think it fairly to be inferred that the lien contemplated by them is only that which we have been alluding to as a claim to appropriate this property to the payment of their debt because they have no other remedy. If this is not their meaning then it must arise out of their claim of tacking it to their mortgage debt, and forcing the petitioner to pay it, on the ground of his petition being a bill to redeem, which we have said it is not. The cases cited by the respondents in support of their claim are cases of set-off, which we have several times intimated might be allowed in this case. It is true the respondents' claim was primarily against Robbins & Lawrence, and as against them it is unliquidated, and perhaps it might be said that, as against them, the exact sum of five dollars per gun would not be the rule of damages; for although they took upon themselves the risk of the British inspection, they did not agree to pay five dollars per gun for the failure to deliver by the stipulated time. But they were manufacturing the guns for the respondents in order to enable them to fill the British Government order. And this was known to the agents of that government, and the interference of these agents in effect wrongfully prevented the respondents from performing their contract and ought therefore to estop the British Government from claiming the forfeiture. And as that government is seeking to foreclose the respondents' interest in this land, we may say we will not allow this to be done, and this land to be taken from the respondents' hands, except upon the terms of allowing this debt to go in reduction of the petitioner's claim upon the land, that is, as a set-off. This is as far as any of the cases cited have gone, and is quite analogous to what was done in the case of *The King of Spain* v. *Hullett,* 7 Bligh, 387, which we think is the strongest case for the respondents that we have been referred to. We know of no other case than that of set-off where matter foreign or not touching or relating to the

matter charged in the original bill has been allowed to be set up as a ground of relief in a cross-bill.

What then upon the whole case should be the decree of the superior court? The respondents have a valid mortgage of the premises which in equity is prior to the petitioner's mortgage, and they are entitled to a decree of foreclosure against the petitioner unless the debt secured by it is paid within a time to be limited by the court. The amount due upon that mortgage debt is found by the committee to have been only $174.30 at the time the report was made and some interest has since accrued upon it. If this debt should be paid by the petitioner within the time limited by the court, then the petitioner will stand as the only party having any incumbrance upon the property, and will of course be entitled to a decree of foreclosure in his favor for the full amount of his claim, less the amount of the respondents' claim against the British Government for damages growing out of the contract of the 26th of March, 1856, as found by the committee, but including with the petitioner's other claim the amount he may pay or may have paid on the decree in favor of the respondents; and if the petitioner should not redeem by paying the balance due to the respondents within the time limited for that purpose, the petitioner should be decreed to convey the legal title to the premises to the respondents, or the same should be vested in them by the decree as fully as if the same were so conveyed. Such certainly would seem to be the only proper course in ordinary cases. But there is not a majority of the court in favor of this disposition of the case under its peculiar circumstances. Some members of the court think that, as this course would enable the petitioner to reap most of the benefits, while he would avoid all the liabilities incident to a petition to redeem, and would thus avoid payment of any portion of the large sum found to be due to the respondents from the British Government, while availing himself, for the benefit of that government, of this property, there is no equity on the part of the petitioner that requires us to advise the superior court to pass such a decree in this case. They think therefore that

under the circumstances of the case it is rather our duty to accede to the request of the respondents' counsel not to advise the passing of any decree in their favor for the small balance due them, but, on the contrary, that we should leave the parties as we found them, by advising that both the bill and cross-bill be dismissed, without prejudice to the bringing of other suits as the parties may be advised, and without cost to either party. And as a majority of the court are unable to agree upon any other result, we must either take this course or send it back to the superior court without any advice whatever. We think it better upon the whole to dismiss the bill and the cross-bill altogether; and we therefore so advise the superior court.

In this opinion DUTTON and PARK, Js., concurred. BUT-LER, J., dissented. McCURDY, J., did not sit.